# Shriver & Dilworth *versus* Nimick & Co.
# Nimick & Co. *versus* Shriver & Dilworth.

*Equitable Jurisdiction of District Court of Allegheny County in Partnership Cases.—Construction of Contract.—"Rest and Residue" and "Stock and Materials" construed.*

M. being indebted to N. & Co. and S. & D., gave them a joint bond upon which judgment was entered, execution issued and defendant's property at two furnaces, consisting of pig metal, material for manufacturing iron, merchandise, horses, wagons, mules, cars, tools, &c., sold to S. & D.; afterwards by agreement, N. & Co. receipted to S. & D. for their portion of the proceeds, in consideration whereof, S. & D. were to run one furnace "until all the *stock* and *material*" at both furnaces should be worked up, and also to ship to N. & Co. one-half of the metal purchased and one-half of that manufactured, to be applied first to the amount for which they had receipted, and then to balance due them in the judgment; then, if the metal proceeds did not pay the judgment, to "sell all the *rest* and *residue*" of the personal property belonging to the furnaces, and apply proceeds to the judgment.

On bill in equity for an account filed by N. & Co. against S. & D., the defendants denied that they were bound to account for the personal property remaining, which was sold by them when they stopped making iron, as embraced under the terms "stock and materials," which they were bound to work up in making iron. The master appointed to state an account, charged the defendants with the proceeds of the said property, deducting their *pro rata* share, and the report being confirmed, on appeal it was *held:* That under the agreement, the defendants were to take charge of one furnace, until the material at both furnaces was exhausted, when the horses, wagons, mules, carts, &c., diminished only by necessary wear, would remain as property not to be worked up, in the sense the term was used in the agreement; and that, with the unsold merchandise, it belonged to the "rest and residue" for which defendants were bound to account to the plaintiffs for their proportion.

The District Court had jurisdiction in equity of the case under section 19, Act 13th October 1840, for under the agreement to manage the furnace and account for the plaintiffs' share of the proceeds, an action of account render would have lain on the common law side of the court to compel an account.

CERTIORARI to the District Court of *Allegheny county.*

This was a bill in equity filed March 13th 1860, by Nimick & Co. against Shriver & Dilworth, in which complainants averred, that in November 1857, John L. Miller executed his bond to plaintiffs and defendants jointly, conditioned for payment to plaintiffs of $19,000, and to defendants of $5600. That on said bond, judgment was had in Clarion county, and execution issued, under which Miller's personal property at Catfish and Franklin Furnaces in that county, consisting of pig metal, material for manufacturing iron, horses, wagons, mules, merchandise, &c., was levied on and sold to defendants; that on the 25th November 1857, the following agreement was made between them :—

"Agreement made 24th day of November 1857, between Shriver & Dilworth and Nimick & Co.

"1. Whereas, John L. Miller gave to said parties jointly his judgment-bond for certain amounts due them respectively, as

[Shriver v. Nimick.]

therein stated; upon which judgment was had in the Court of Common Pleas of Clarion county, and execution issued thereon, and levied upon the personal property of said Miller, at Catfish and Franklin Furnaces, and the same sold by the sheriff, and purchased by the said Shriver & Dilworth, at prices which will appear by the return of said writ.

"2. Now, for the consideration hereinafter mentioned, said Nimick & Co. agree to receipt to said Shriver & Dilworth for the proportion of the proceeds of said sale, applicable to the share of said Nimick & Co. in said judgment.

"3. In consideration whereof, said Shriver & Dilworth hereby agree, that they will proceed without delay to work up all the material by them purchased at said sale, as aforesaid, and ship to said Nimick & Co. at Pittsburgh (at the risk of said Nimick & Co., and they paying freight thereon), one-half of all the pig metal produced as aforesaid; and also one-half of the pig metal by them acquired in virtue of said sheriff's sale. The net proceeds arising from the sale by said Nimick & Co. of said metal, to be applied, first, to the payment of said Nimick & Co.'s share in said judgment, for which they have agreed to give their receipt in advance to said Shriver & Dilworth as aforesaid, and the residue as a credit to said Miller, on the interest of said Nimick & Co. in the residue of said judgment unsatisfied by said sheriff's sale.

"4. And the said Shriver & Dilworth agree to run said Catfish Furnace, until all the stock and material at both furnaces shall be worked up as aforesaid, saving to said Shriver & Dilworth the right to stop finally their running said furnaces, in case they shall find it detrimental to their interest to continue the work. And if the net proceeds of the metal produced and applied as aforesaid, shall not be sufficient to pay the full amount of said judgment, said Shriver & Dilworth will then sell all the rest and residue of the personal property of and belonging to said furnaces, and apply the proceeds of said sales to or toward the payment of the residue of the amount of said judgment.

"5. It is understood that Shriver & Dilworth are not to be liable for any of the said personal property which may be destroyed by fire; and in case they shall be evicted from the premises before having worked up all the aforesaid stock and material, they shall sell the same to the best advantage that they can, and apply the net proceeds to the payment *pro rata* of the amount of said judgment.

"(Signed),     SHRIVER & DILWORTH,
                        NIMICK & Co."

"This paper was not signed by Nimick & Co., nor delivered until 25th November 1857.

"(Signed),     R. MORROW."

5 WR.—6

[Shriver *v.* Nimick.]

" That, accordingly, plaintiffs gave their receipt, and defendants proceeded to run said furnaces till the latter part of the year 1858. In the mean while, they shipped part of the metal made by them, which reduced plaintiffs' debt against Miller to $12,000, but whether defendants shipped one-half plaintiffs do not know, as defendants refused to account; that defendants sold all the pig metal but that shipped to plaintiffs, and all the rest and residue of the personal property belonging to the two furnaces as aforesaid, but did not ship to plaintiffs one-half the metal, and did not apply the proceeds of sale of the personal property to said judgment; that defendants, though often requested, have refused to account, &c."

Interrogatories followed asking for the amount of personal property acquired by defendants at sheriff's sale; a list of articles and prices; what amounts were applicable to plaintiffs' judgment; what amount of stock and material for making iron and other personal property was on hand when defendants ceased to work the furnace, its value, and how disposed of; what amount of iron was made by defendants, and what proportion shipped to plaintiffs.

The prayer for relief was, that an account might be taken of the matters and things set forth in the bill, and defendants decreed to pay to plaintiffs the amount found due them, also for general relief.

On the 2d of July 1860, the defendants filed their answer, in which they admitted the purchase of personal property at sheriff's sale, as set forth in bill, but alleged that there were prior executions, to the amount of about $3000, previously levied on the same, which defendants had to pay. That there was a contract in writing between plaintiffs and defendants, by which it was agreed that plaintiffs should give their receipt, and defendants should work up the material purchased at sheriff's sale, and ship one-half the metal to plaintiffs. And also, that if net proceeds of said metal should not pay off the said judgment, defendants should then sell all the rest and residue of the personal property, and apply proceeds to payment of the residue of said judgment; but averred that the last agreement was only to hold good, in event defendants should stop running the furnaces before working up the stock and materials bought by them at sheriff's sale; and then averred that defendants did run Catfish Furnace till the whole stock and personal property purchased at sheriff's sale was worked up, except a small quantity of wood widely scattered, ore, goods in store, harness, carts, &c., in all to the value of about $700, which was sold and applied to repayment of money borrowed to run the furnace, and manufacture the pig metal; that the wood and ore not worked up was worth about $75. Respondents denied that they ever agreed to run or did

run Franklin Furnace; gave the amount of pig metal bought at sheriff's sale, and the amount manufactured by them; averred that one-half thereof was shipped to plaintiffs, and denied that respondents ever refused to account for the same—on the contrary, that they kept plaintiffs advised of the amount of iron bought and manufactured by defendants, and did account for the same by shipping one-half thereof to plaintiffs.

They averred, also, that the whole personal property bought by them at sheriff's sale, as well that bought under the senior executions, as that under plaintiffs' and defendants' joint execution, was, except the iron, of which plaintiffs received their half, fairly and honestly put in and applied to the manufacturing of pig metal.

The answer set forth a "full and true account" of their receipts and expenditures at Catfish Furnace in the manufacture of iron, from which it appeared that the whole amount of their receipts for sales, including all the personal property bought at sheriff's sale, but not including the iron, was   .   .   .   $14,150.00
The whole amount of their expenditures was   .   $20,833.00
Showing an excess of expenditures,   .   .   .   $6,683.00

Averred their inability to give a list of the property purchased by them, and the prices, and that after diligent search they have been unable to get one, and denied all allegations of the bill not admitted, or confessed and avoided, and praying to be dismissed with costs.

To this a general replication was filed, August 4th 1860, and on the same day the court appointed John P. Penny, Esq., examiner to take testimony, and master to state an account between the parties.

The report of the master was filed May 23d 1861, in which, after stating the above facts briefly, he proceeded :—

" The only controversy is in reference to the manner of accounting for the rest or residue of the personal property which remained on hand when the defendants finished working up the stock and material.

"In the opinion of the master, the true construction of the agreement simply required the defendants to take charge of the furnace, and to run it until the whole stock of material for manufacturing iron at both furnaces should be worked up, and for this purpose they had the right to use the property acquired by the sale in the ordinary way. The stock and material would be necessarily consumed in the manufacture of metal, but the other personal property, such as horses, mules, wagons, cars, &c., would remain, diminished only by the necessary wear, for this species of property could not be 'worked up' in the sense in which that term is used in the agreement. The merchandise was to be used in the ordinary way, by selling to hands and employees

about the furnace, and only the remnant on hand when the work stopped can be considered as embraced in the terms 'rest and residue' of personal property to be sold and accounted for. Any other construction in reference to the merchandise would have required the defendants to charge themselves with the entire sales of the stock originally purchased, which was certainly not contemplated by the parties.

"The only difficulty in stating the account, upon the foregoing basis, arises from the very imperfect answer of the defendants. There is nothing in their answer from which it can be determined certainly at what precise time they finished working up the stock and material, and ceased running the furnace; and it further appears by their account filed, that some of the property with which they are chargeable, was disposed of by them before they finally closed the business. The master has, however, from statement of sales made at auction on the 12th day of April 1858, assumed that as the date at which they finally closed the business, and has charged them with the sales of merchandise made on that day, and subsequently, as shown by their account. He has also charged them with the amount admitted to have been received for mules between the 1st and 16th of March 1858, as being clearly a part of the personal property for which they should account under their agreement.

"The agreement required the plaintiffs to account for the net proceeds of the metal received by them from the defendants, and credit the same upon the amount receipted by them to the sheriff. This they allege they have done, but it nowhere appears, in either the bill or answer, what the precise amount of the net proceeds of the sales of metal was. The plaintiffs allege it reduced their debt to about twelve thousand dollars, without any reference to interest. It would seem, therefore, that the net proceeds amounted to about seven thousand dollars. It being admitted that defendants have shipped one-half of all the metal acquired under the sale, and one-half of the metal manufactured by them, as required by their agreement, and that the plaintiffs have received and credited the net proceeds thereof as required, the master has omitted any reference to the metal in the account stated, as he could only charge the amount claimed to be shipped by the defendants, and credit the same amount admitted to be received by the plaintiffs, without fixing any price to either.

"The master, therefore, has stated the account between the parties by charging the defendants, as before stated, with the gross amount received for mules on the 16th of March 1858, and for merchandise, wood, cars, tools, scrap-iron, &c., received on and after the 12th of April 1858—amounting in all to seven thousand two hundred and ninety-two dollars and sixty-one

cents, and allowing them credit for their *pro rata* share, to wit, twenty-two and one fourth per cent., which amounts to sixteen hundred and fifty-nine dollars and six cents; leaving a balance due to the plaintiffs of five thousand six hundred and thirty-three dollars and fifty-five cents, as will appear by the account hereto attached. And as the account attached to defendants' answer shows that much the larger portion of the personal property on hand was sold before the 1st of May 1858, the master is of opinion that the interest upon the balance should commence from that date.

"All of which is submitted."

Before filing this report it was submitted to the counsel for the parties, by whom the following exceptions were filed:—For the defendants:—1. That the master has misconstrued the article of agreement between plaintiffs and defendants as regards the true intent and meaning thereof.

2. That the master has held the defendants liable to account for, and charged them with the amount received for merchandise, wood, cars, &c., on and after April 12th 1858, and before they quit the business.

3. That the master has held the defendants liable to account for, and charged them with the amount received for mules March 16th 1858, and before they stopped manufacturing.

4. That the master did not report that the defendants had fully accounted to the plaintiffs to the full extent of their liability.

5. That the master fixed the balance due on plaintiffs' judgment against Miller to have been $12,000, with interest; whereas defendants claim that the evidence shows that that amount was inclusive of interest.

6. The defendants claim, in opposition to the opinion of the master, that according to the true intent and meaning of the agreement aforesaid, they had the right to sell and dispose of all the personal property bought by them at sheriff's sale and apply the proceeds if necessary to reimburse themselves for their outlay in carrying on the furnace, and were only accountable for the residue, if any—and that the account filed by them shows that said proceeds were so applied, and still left defendants largely losers by the operation.

For the plaintiffs:—1. The master erred in deciding that the defendants are only liable to account for so much of the merchandise acquired at said sheriff's sale as remained on hand when they ceased to run the furnace.

2. The master has not charged defendants with all the merchandise with which they are chargeable.

These exceptions were considered by the master, but produced no change in his report.

On argument in the District Court the exceptions were all dis-

[Shriver *v.* Nimick.]

missed, the report of the master confirmed, and the defendants adjudged to pay the complainants $5633.55, with interest from May 1st 1858, and costs, to be taxed by the prothonotary.

The case was thereupon removed into this court by both parties, when the following errors were assigned :—

By the plaintiffs :—

The court erred in overruling the foregoing exceptions of plaintiffs to the master's report.

By the defendants :—

1. The court erred in dismissing defendants' exceptions, and confirming the master's report.

2. The court erred in not dismissing the plaintiffs' bill.

*H. Burgwin,* for Shriver & Dilworth, contended that the bill should have been dismissed for want of jurisdiction. The plaintiffs had a full and adequate remedy at law, by action on the contract. Besides, there was here no mutuality of accounts, which is essential to give equity jurisdiction, except when the account is ancillary to discovery : Baker *v.* Biddle, 1 Baldwin's R. 394–416 ; Fowle *v.* Lawreston, 5 Peters 495 ; Phillips *v.* Phillips, 12 Eng. Law & Eq. 259. See 1 Story's Eq., § 459, for summary on this point. But this bill cannot be sustained as one for discovery : see 1 Story's Eq., § 74 ; Russel *v.* Clarke, 7 Cranch 69.

The bill should be dismissed for want of evidence, on which to state an account, even admitting our liability to account.

But, apart from the above objections, the controversy turns upon the proper construction to be given to the fourth paragraph of the article, and, more particularly, as to the proper application of the words, "*rest and residue* of the personal property."

The plaintiffs' construction was so unreasonable, that it does not seem to have been for a moment entertained by the master ; and no appeal having been taken to the decree of court dismissing the plaintiffs' exceptions, it will not here be further discussed.

The master's construction, though more reasonable than the other, is not reconcilable with the phraseology of the article, and was adopted, perhaps, from an amiable desire to steer a middle course between the positions of plaintiffs and defendants.

But it is also inconsistent in this : he held that we could sell merchandise while working the furnace, and, with the proceeds, employ labour for manufacturing the iron, yet that having hired labour, we could not sell the merchandise *after* we ceased working, and apply the proceeds to pay for that labour.

But the construction put on this article by defendants, and fairly and honestly carried out, is both reasonable and in perfect accordance with its phraseology. They claim that by the true letter and spirit of their agreement, the whole personal property

[Shriver v. Nimick.]

bought by them was to be held as so much *stock* or capital, with which they were to enter upon the manufacture of metal, for the joint and equal benefit of plaintiffs and defendants; that, in consideration of their getting one-half the metal, their debt being only one-third that of plaintiffs, they were to give the business their personal attention, and carry it on upon their own responsibility; but with provision that, in case they ceased work before all the ore was worked up, either by eviction or their own choice, they should account for all the property remaining in their hands after repaying their expenditures. It being remembered, too, that by the agreement, the plaintiffs acquired an equal interest in all the property purchased under the senior execution against Miller, in which, otherwise, they had none.

The whole difficulty in construing this agreement, hinges not on the meaning of *rest and residue*, or of *working up*, but on the meaning and proper application of the words *stock and material*. We contend that these words are used in this article as referring to the *personal property* generally, which was acquired at sheriff's sale, and not as denoting those articles only which could be actually and physically worked up in the manufacture of iron, as wood, charcoal, and ore. This construction, which removes the whole difficulty, is reasonable, and is completely borne out on a careful analysis of the article.

There is nothing in the proper meaning of these words stock and material, which should narrow their application, as contended for on the other side. *Stock* is a word of most extensive application, and if we translate the word material purchased at sheriff's sale, by the French word *matériel*, we have exactly the idea intended by the use of both these words, stock and material.

But independently of all questions of construction, we object to the master's report, as being founded on insufficient evidence —or rather upon no evidence, and contrary to all the evidence there was. He complains in his report of the insufficiency of the testimony, but we are not responsible for that. The master was not bound to state an account upon mere assumptions, some of which were erroneous and contrary to the evidence.

*Hamilton* and *Acheson*, for Nimick & Co., in reply.—1. The bill was not demurred to for want of jurisdiction, nor was the question raised either in the answer or by the plea: Railroad Company *v.* Cooper, 9 Casey 278.

2. The appellants will be confined to exceptions made before the master: Equity Rules 66; Mengas' Appeal, 7 Harris 222; Brightly's Equity 546. Nor will the report be reviewed except for plain mistake: Stedman's Appeal, 5 Barr 413; Mengas' Appeal, 5 Harris 222.

All the exceptions of defendants, except the fifth, involve the

[Shriver *v.* Nimick.]

construction of the article of agreement.   The whole case turned
on this.

The construction contended for by the appellants, that they
might sell the merchandise and the other personal property, and
apply the proceeds to defray the expenses of the conversion,
would compel the appellees to contribute nearly three-fourths
of the entire means, and yet receive but one-half of the pro-
duct; and this, too, in the face of the fact that this product was
only 457 tons, while the metal purchased at the sale and ready
for market amounted to 279 tons.

The exception which was intended to raise the question of the
construction of the agreement, is so vague and indefinite, that
we are not bound to notice it; but think we have shown that the
master did not misconstrue it except to the prejudice of the ap-
pellees, in respect to the merchandise.

The second exception has relation only to the time of appel-
lants being held liable to account.   It is immaterial, under the
agreement, when the common property was sold.   If it was not
worked up, and they disposed of it for money, they were liable
to account to appellees for their proportion of the proceeds;
otherwise the appellants might,.by making sale of the common
property at any time previous to finally stopping work, appro-
priate to themselves the whole of the proceeds.

These observations are alike applicable to the third exception,
which only differs from the second in date, and in referring to a
different portion of the property.

But is it true, as alleged, that the property referred to in the
second and third exceptions, was disposed of before appellants
stopped manufacturing?   The master has found as a fact, that
appellants closed their business at the furnace on the 12th day
of April 1858, and has charged them with the sales of merchan-
dise made on that day and subsequently, as shown by their
account.

It is difficult to reconcile the sale of all the mules, ore, wood,
and coal-cars, store goods, and implements, such as shovels and
wheelbarrows, with the continued carrying on of the work.

The fourth exception is deficient in precision, and does not
require any special notice.

As to the fifth exception.   The bill alleges, that, after apply-
ing the net proceeds arising from the sale of the metal, there
remained a balance of $12,000 due to complainants on the judg-
ment.   The appellants do not directly or explicitly contradict
this, but merely allege that if the appellees had sold the metal
received by them at the full market price when received, the
amount due to them upon the judgment would be less than
$12,000, without alleging how much less, whether one dollar or
one thousand.   This was not a sufficient traverse of the allega-

tion in the bill; and the master was right in finding it as a fact, that this alleged balance was still due; and besides, there was no evidence before him as to when or at what price the appellees sold, or might have sold, the metal.

The sixth exception is substantially the same as the first three, and involves the construction of the agreement.

In none of them have appellants claimed that the master erred in charging too much in respect of the merchandise and other property which came into their hands, and was sold by them. The objection is to their being charged with any of it, under their construction of the agreement.

The words "stock" and "material," as applied to the production of iron, are customarily used as synonymous or convertible terms, and mean the substance or matter of which the iron is to be made; and that they are used in this sense in the agreement, is apparent from the expression "work up," in connection with "material," in the third paragraph, and of "worked up" in connection with "stock and material," in the fourth paragraph. It would be absurd to suppose that the stock and material could be "worked up" by converting into money the appliances for working; for, in order to accomplish the purposes of the agreement, the appellants would be obliged to reconvert the proceeds into suitable property.

In the answer of appellants to the first interrogatory, they admit that the personal property acquired by them in virtue of the judgment and execution in favour of the appellants and appellees against John L. Miller, amounts to about $17,988.01, and that the whole of that sum, less the amount of the costs on the writ, was applied as a credit on said judgment.

If there were prior executions which were liens upon the property, the appellants were bound to show what they were, and their amount; that part of their answer not being responsive to the bill, but new matter.

In support of the exceptions filed by them, they argued 1. That, in respect to the merchandise acquired at the sheriff's sale, the master misconstrued the contract to their prejudice by classifying it with stock and material which might or should be worked up into iron, and in charging them only with so much as remained, when they ceased to run the furnace. It might have been sold or transported to market without reference to the running of the furnace, and they should have been charged with the whole of it.

2. The bill avers, and the answer admits, that appellants purchased merchandise at both the stores belonging to the furnaces. The account shows that they had merchandise for $4457.44, and that the sale for cash amounted to $8245.27. There is no admission in the answer as to profits; but, allowing an average

[Shriver *v.* Nimick.]

profit of 25 per cent., there would be $2673.47 sold over the sum with which they have charged themselves, making, together, $5571.80, the probable amount they acquired at sheriff's sale, and $900 more than they are charged with. They were trustees of plaintiffs in respect to this property, and are to be held to strict fidelity and accountability.

The opinion of the court was delivered, November 7th 1861, by Thompson, J.—The parties to this controversy were joint creditors of John L. Miller, of Clarion county, and had a judgment against him for the sum of $24,600; the undisputed proportions of which were $19,000 to the plaintiffs below, and $5600 to the defendants. On the sale of the personal effects of Miller, on this judgment, Shriver & Dilworth bid them in, and the plaintiffs paid their proportion of the purchase-money of the sheriff's sale, by receipting the execution for that sum; the balance was receipted by the defendants, and the costs were afterwards paid by them, and the amount charged against the furnace, which was, by the agreement between the parties of the 24th November 1857, to be run for their joint benefit, until the "stock and material" purchased at the sheriff's sale were worked up. Shriver & Dilworth proceeded to run the furnace in pursuance of the agreement, and delivered all the metal, both that which was purchased at the sale, and that made afterwards, to the plaintiffs, in the proportion agreed upon, according to the terms of the articles of agreement, and there is no dispute about this.

But the defendants denied that they were bound to account to the plaintiffs for any of the personal property, such as merchandise, tools, wagons, carts, cattle, horses, and mules, in and about the Catfish and Franklin Furnaces, and purchased as already stated; alleging that it was all embraced under the terms "stock and material," which they were to work up in making iron under the agreement for the benefit of the plaintiffs and themselves. In other words, they claim that that property was to be applied to the expense account, in working up the coal, wood, and ore on hand, and in that way turned into iron for the benefit of the parties. This the master thought was not the true construction of the contract, and we fully concur with him in that, as well as in the manner in which he states the rights of the parties under this portion of the contract. We will, therefore, not restate what is so well stated and sustained by the master. It seems obvious, that, if all the expenses of the furnace were to be paid out of the joint property, it being owned in the proportion of $19,000 to $5600, or more than three-fourths to less than one-fourth, the metal purchased and that made would not have been equitably divided equally, even considering the personal superintendence of the defendants in making it. The personal property on hand

[Shriver v. Nimick.]

necessarily consumed in manufacturing or working up the stock, the master thought should be applied in the progress of the work, as necessary to the accomplishment of the purpose in view by both parties. This, we think, was the true and fair construction of the contract. Beyond this, the defendants were bound to defray expenses, in consideration evidently of receiving an equal share of the metal purchased, as well as to be manufactured. The equality provided for, in this particular, could not well be accounted for on any other basis, and we think it was obviously the meaning of the agreement between the parties.

But an objection *in limine* was interposed by the defendants, namely, that the District Court had not jurisdiction in equity of this case. We think, without discussing the mode of raising this question, that the objection is not sustainable. The transaction, it is true, is not in the ordinary forms in which we usually discover the relation of principal and agent or factor, but it has the substance, perhaps, of both. The trust and confidence incident to these relations clearly appears in the agreement in which the duty to manage for the benefit of both parties is found, and also the duty imposed and undertaken to sell the *residuum* of the personal property and to account for the plaintiffs' share of the proceeds in the manner agreed upon. Certainly an action of account render would have lain, on the common law side of the court, under the circumstances alluded to, to compel an account of the moneys received from this joint property. There was the property on the one hand, and its disposition on the other by the parties intrusted. It presented, we think, a case in which the action of account render would have been a proper remedy. This being so, the District Court had jurisdiction of it in equity by the 19th section of the Act of 13th October 1840: Digest 306.

Appeal dismissed at the costs of the appellants.

In the appeal by NIMICK & Co.

The opinion of the court was delivered, November 7th, 1861, by

THOMPSON, J.—In Shriver & Dilworth v. Nimick & Co., just decided, we approved of the views of the master, in regard to the disposition of the "*rest and residue*" of the personal property at Catfish Furnace, when the stock and materials for making iron were all worked up. We think this applied as well to the merchandise as to any of the other personal property, and accordingly we affirm the decree of the District Court at the costs of the appellants.